# COURT OF APPEALS
# DECISION
# DATED AND FILED

## June 30, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP2169-CR**

Cir. Ct. No. 2020CF206

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ARIK JAMES ULWELLING,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Oneida County: MICHAEL H. BLOOM, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Arik James Ulwelling appeals a judgment convicting him, following his no-contest plea, of operating a motor vehicle while

under the influence of an intoxicant ("OWI"), as a fourth offense. Ulwelling argues that the circuit court erred by not granting his motion to suppress the evidence resulting from his blood draw because the medical laboratory technician drew his blood in an unreasonable manner. Ulwelling also argues that he is entitled to withdraw his no-contest plea because his trial counsel was constitutionally ineffective by failing to file a motion challenging the legality of Ulwelling's traffic stop. We reject Ulwelling's arguments and affirm.

## BACKGROUND

¶2 According to the criminal complaint, at approximately 2:11 a.m., on September 27, 2020, Woodruff Police Officer Brian Czlapinski executed a traffic stop on a 2016 Ford Explorer due to the vehicle being operated without its tail lamps lit. When Czlapinski made contact with the driver, Ulwelling, he detected the odor of intoxicants and observed that Ulwelling's eyes were red and glossy. Following field sobriety tests, Czlapinski arrested Ulwelling for OWI, read him the Informing the Accused form, and requested that Ulwelling consent to a blood draw. Ulwelling refused.

¶3 Officer Czlapinski then transported Ulwelling to the Howard Young Medical Center, where he applied for and secured a search warrant to collect a blood sample from Ulwelling. A laboratory technician conducted the blood draw at approximately 3:30 a.m. Ulwelling's blood alcohol concentration was 0.188 g/100 mL. The State subsequently charged Ulwelling with OWI and operating a motor vehicle with a prohibited alcohol concentration, both fourth offenses.

¶4 Ulwelling moved to suppress the blood test results, arguing that his blood draw violated the Fourth and Fourteenth Amendments to the United States

Constitution and Article I, section 11 of the Wisconsin Constitution because the lab technician who drew his blood violated the relevant hospital procedures, especially in terms of the number of attempted draws, thereby making that search unreasonable. Both Paul Maleko, the lab technician who drew Ulwelling's blood, and Ulwelling testified at the suppression hearing.

¶5 Maleko testified that he had performed "thousands" of blood draws in his more than 20-year career as a medical lab technician. He described the process for a typical blood draw when law enforcement requests one. Although Maleko did not recall performing Ulwelling's blood draw, he acknowledged that he had performed the blood draw, given that his name appeared on the chain of custody form. Maleko then described the process by which he would have drawn Ulwelling's blood. He also described what would occur if he failed numerous attempts to draw an individual's blood.

¶6 Maleko testified that if he failed to draw blood on the first attempt, he would "remove the tourniquet, remove the needle, apply post-vein puncture care, and proceed to evaluate for another location, or possibly use the same vein in the same location depending on why the draw failed." If a second attempt failed, Maleko continued, "normal workflow" would require him to ask another phlebotomist to perform the draw, but that option was not usually available to him because he worked night shifts when no other laboratory staff was available. Maleko added that while nursing staff was available at the hospital at that time of day, they were not "signed off to perform" blood collections for law enforcement. Thus, Maleko would attempt to draw the blood a third time. As for a fourth attempt, Maleko testified it would not adversely affect the blood test results, but he would have to ensure there was "a minimum of two to five minutes between applications of tourniquet to allow the blood to kind of circulate through."

¶7 Maleko also testified that he was aware of the hospital's policies and procedures regarding blood draws. He admitted that there was a policy that another person should be called to attempt a third blood draw after two failed attempts and that he did not follow that policy when he worked night shifts. Maleko further testified that needles should be changed between blood draw attempts for safety purposes and that the most concerning reason for doing so was the potential for infection at the draw site.

¶8 Ulwelling testified that he had been employed as a phlebotomist from 2004 to 2006, that he had training in phlebotomy, and that he had not routinely performed any blood draws since that time. Ulwelling also testified that, at the time of the hearing, he worked as a vascular technician at the same hospital as Maleko, performing ultrasounds that were used to diagnose vascular issues outside of the heart. He further testified that he was familiar with the hospital's policies and procedures, and he explained that the purpose of having only two blood draw attempts was the patient's safety and that multiple attempts at the same vein could contaminate the blood sample.

¶9 Ulwelling testified that Maleko made four attempts to draw blood from Ulwelling's right arm and that Maleko changed the needle only after the third attempt. Ulwelling also testified that he told both Maleko and Officer Czlapinski that he objected to a fourth attempt to draw his blood, noting his knowledge of the hospital's policy. Ulwelling further testified that, after failing a fourth time, Maleko attempted to draw blood from Ulwelling's left arm, was able to draw some blood, but then partially withdrew the needle to reangle it. Ulwelling described this process as "probing," which he said raised two concerns: patient safety and the potential introduction of arterial blood into the venous blood

4

collection. He added that both probing and the introduction of arterial blood could cause an increase in blood alcohol concentration.

¶10    The circuit court denied Ulwelling's suppression motion, concluding there was no basis for suppression. The court noted that Officer Czlapinski obtained a warrant for a blood draw and, regardless of whether Maleko violated the hospital's policy regarding blood draws, there was no conduct that supported a conclusion that the blood draw Maleko performed was unreasonable such that it rose to the level of a constitutional or statutory violation.

¶11    Ulwelling ultimately pled no contest to OWI, as a fourth offense.[1] The circuit court withheld sentence and placed Ulwelling on probation for two years. Ulwelling then sought postconviction relief in the form of plea withdrawal, arguing that his trial counsel was constitutionally ineffective for failing to file a suppression motion challenging the basis for the traffic stop that led to Ulwelling's arrest. Ulwelling claimed that, pursuant to WIS. STAT. § 347.06(1) (2023-24),[2] the vehicle he operated was not required to have its tail lamps lit as long as the headlamps were the type that automatically turn on when the vehicle is started and comply with the federal standard for daytime running lamps. Because he was not operating a vehicle in violation of a traffic law (at least under this interpretation of § 347.06(1)), Ulwelling contended that Officer Czlapinski had no reasonable suspicion of any unlawful activity to constitutionally initiate a traffic stop.

---

[1]  The State dismissed the operating with a prohibited alcohol concentration count.

[2]  All references to the Wisconsin Statutes are to the 2023-24 version.

¶12     The circuit court held a ***Machner***[3] hearing, during which Officer Czlapinski; Alissa Schneiderman, the owner of the 2016 Ford Explorer that Ulwelling was driving at the time of the stop; Ulwelling; and Ulwelling's trial counsel testified.

¶13     Officer Czlapinski testified about his observations that prompted him to conduct the traffic stop that led to Ulwelling's arrest.  Czlapinski testified that he initiated the traffic stop because he observed Ulwelling's vehicle traveling without its tail lamps lit.  He also testified that the vehicle's headlamps were on and that he informed Ulwelling that the vehicle's lights were not on all the way, after which Ulwelling turned them fully on.  Czlapinski further testified that he believed that "all the vehicle's lights have to be on after dark" and that if a vehicle had "daytime running lights or automatic lights, they should be in the on position."

¶14     Schneiderman explained how the lights on her vehicle operated, and she provided videos that she recorded demonstrating how the lights worked.  She explained that, regardless of the light control's position, the vehicle's headlamps remain on as long as the vehicle ignition is activated.  Ulwelling testified that the vehicle's headlamps were on when Officer Czlapinski initiated the stop, but he could not recall whether he informed his counsel that the vehicle he drove that night had headlamps that were always on.

¶15     Ulwelling's counsel testified that Ulwelling believed the vehicle's headlamps were on, but when counsel reviewed Officer Czlapinski's body camera video, it showed Ulwelling turning the vehicle's light controls and the lights

---

[3] *See **State v. Machner***, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

illuminating in the front. Counsel denied knowing that the vehicle's daytime running lamps were always on, and he testified that Ulwelling was not familiar with the vehicle because it was not his. Ulwelling's counsel further testified that, under his reading of WIS. STAT. § 347.06, having the two headlamps on and the tail lamps off did not meet the statutory exception. If that scenario did satisfy the statutory exception, counsel testified he would have raised the issue in a suppression motion.

¶16 The circuit court denied Ulwelling's postconviction motion, concluding that WIS. STAT. § 347.13, rather than WIS. STAT. § 347.06, applied. According to the court, § 347.06 "appears to require when lamps, including headlamps, tail[]lamps, and clearance lamps, [with] which a vehicle are required to be equipped, are lighted." In contrast, the court continued, § 347.13 applied "to a vehicle being driven during hours of darkness when the tail[]lamps are not, during hours of darkness, emitting a red warning light that is visible to another vehicle traveling 500 feet behind it." The court found that, in this case, the vehicle's tail lamps were not illuminated during hours of darkness, violating § 347.13's requirement that the tail lamps be lit, and it concluded that the violation gave rise to reasonable suspicion for the stop.

¶17 Alternatively, the circuit court concluded that if its interpretation was incorrect, then Officer Czlapinski made an objectively reasonable mistake of law. Under either alternative, the court denied Ulwelling's postconviction motion to withdraw his plea on the basis of ineffective assistance of counsel. Ulwelling appeals.

**DISCUSSION**

¶18 On appeal, Ulwelling challenges the circuit court's denial of his motion to suppress the blood test results and the court's denial of his postconviction motion for plea withdrawal, raising the same arguments he previously made in both of those motions.

## I. Motion to suppress blood test results

¶19 We review a circuit court's decision on a motion to suppress using a two-part standard of review.[4] *State v. Adell*, 2021 WI App 72, ¶14, 399 Wis. 2d 399, 966 N.W.2d 115. We uphold the court's findings of historical fact unless they are clearly erroneous, and then we "independently appl[y] constitutional principles to those facts." *State v. Kozel*, 2017 WI 3, ¶30, 373 Wis. 2d 1, 889 N.W.2d 423 (citation omitted).

¶20 "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution" protect persons against unreasonable searches and seizures. *State v. Tullberg*, 2014 WI 134, ¶29, 359 Wis. 2d 421, 857 N.W.2d 120 (citation omitted). A blood draw constitutes a search under the Fourth Amendment, and it ordinarily requires a search warrant unless one of the exceptions to the warrant requirement applies. *Birchfield v. North Dakota*, 579 U.S. 438, 455-56 (2016); *State v. Blackman*, 2017 WI 77, ¶4, 377 Wis. 2d 339, 898 N.W.2d 774. Because blood draws are searches under the Fourth Amendment, they must be performed in a reasonable manner. *See*

---

[4] We may review a circuit court's denial of a motion to suppress evidence notwithstanding a defendant's entering of a no-contest plea. *See* WIS. STAT. § 971.31(10).

*Schmerber v. California*, 384 U.S. 757, 768 (1966). When a blood draw is not performed reasonably, the search is unlawful, and the "illegally obtained evidence will be suppressed as a consequence of the law enforcement officers' misconduct." *See State v. Dearborn*, 2010 WI 84, ¶15, 327 Wis. 2d 252, 786 N.W.2d 97.

¶21    In *Schmerber*, the Supreme Court concluded that a blood draw done by a "physician in a hospital environment according to accepted medical practices" was performed in a reasonable manner. *Schmerber*, 384 U.S. at 771. Although it was not presented with a situation of "a search involving use of a medical technique, even of the most rudimentary sort, … made by other than medical personnel or in other than a medical environment," the Court noted that such a situation would raise serious questions, given that it invited "an unjustified element of personal risk of infection and pain." *See id.* at 771-72. As we observed in *State v. Daggett*, 2002 WI App 32, ¶15, 250 Wis. 2d 112, 640 N.W.2d 546 (2001), *Schmerber* did not establish a bright-line rule as to the reasonableness of the manner in which a blood draw is performed. Rather, it recognized a spectrum of reasonableness by noting what is generally reasonable and what could raise serious questions of reasonableness. *Daggett*, 250 Wis. 2d 112, ¶15.

¶22    Ulwelling asserts that Maleko performed a blood draw that was inconsistent with established hospital procedures that are intended to preserve a sample's integrity and to prevent infection and injury to a patient. Because Maleko performed the blood draw "with little regard to Mr. Ulwelling's health" and in a manner that would have endangered Ulwelling's health, Ulwelling contends that the blood draw was unreasonable.

¶23    Assuming without deciding that Maleko's failure to perform Ulwelling's blood draw in accordance with the hospital's policies and procedures

rendered the blood draw unreasonable, we conclude that suppressing the blood test result is not the appropriate remedy, under the facts of this case, because there was no law enforcement misconduct.

¶24    The application of the exclusionary rule "is restricted to cases where its remedial objectives will best be served." *Dearborn*, 327 Wis. 2d 252, ¶35. The rule "generally serves to 'deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence.'" *Blackman*, 377 Wis. 2d 339, ¶68 (citation omitted).  Marginal deterrence is insufficient to justify exclusion. *Dearborn*, 327 Wis. 2d 252, ¶35.  Rather, the exclusionary rule applies when the benefits of deterring law enforcement misconduct "outweigh the substantial costs to the truth-seeking and law enforcement objectives of the criminal justice system." *Id.*, ¶38.

¶25    Here, suppressing Ulwelling's blood test result will not serve a remedial objective because, under the facts of this case, suppression would have no deterrent effect on law enforcement misconduct.  Officer Czlapinski acted as required by the Fourth Amendment: he applied for and secured a search warrant to collect a blood sample from Ulwelling after Ulwelling refused to consent to a blood draw, and he then executed the search warrant by having a licensed and experienced phlebotomist draw Ulwelling's blood in a hospital setting.  In these circumstances, any limited benefit of deterring law enforcement misconduct does not outweigh the costs of suppressing Ulwelling's blood test result because there is no misconduct to deter.  Therefore, suppressing Ulwelling's blood test result is not the appropriate remedy.

¶26    In his reply brief, Ulwelling argues that Maleko acted as an agent of the State and that "deterrence of phlebotomists who know that they are acting at

the behest of the State will encourage them to perform their duties in a reasonable manner." Ulwelling, however, did not show that Maleko's alleged deviations from the hospital's policies and procedures in this instance resulted in an infection at the draw site or raised any actual safety concerns. Nor did Ulwelling show that the probing introduced arterial blood into the blood sample, causing a higher blood-alcohol content. Rather, Ulwelling seeks suppression of the blood test simply because the hospital's policies and procedures were not followed and those procedures exist to generally ensure safety.

¶27 The State, through Maleko, showed the circumstances under which Maleko would have drawn Ulwelling's blood the night of the arrest (he worked alone on the night shift) and why he would have performed the blood draw in the manner he did (there were no other staff available to attempt blood draws after his failed second attempt). As we concluded above, these specific circumstances do not warrant suppression.

## II. Plea withdrawal

¶28 We review a circuit court's denial of a postconviction plea withdrawal motion under an erroneous exercise of discretion standard. *State v. Savage*, 2020 WI 93, ¶24, 395 Wis. 2d 1, 951 N.W.2d 838. A defendant may withdraw his or her plea after sentencing when he or she shows, by clear and convincing evidence, that plea withdrawal is necessary to correct a manifest injustice. *Id.* One way to establish a manifest injustice is for the defendant to show that he or she received constitutionally ineffective assistance of counsel. *Id.*, ¶25.

¶29 An ineffective assistance of counsel claim requires a defendant to show both that his or her trial counsel's performance was deficient and that the

11

deficient performance prejudiced the defense. *See id.* Whether a defendant received ineffective assistance of counsel is a mixed question of law and fact. *Id.* We uphold the circuit court's findings of fact unless they are clearly erroneous, but whether counsel's performance constitutes ineffective assistance is a question of law that we review de novo. *Id.* If the defendant fails to satisfy either element of the ineffective assistance of counsel analysis, we need not address the other element. *Id.*

¶30 Trial counsel's performance is deficient when his or her representation falls below an objective standard of reasonableness considering all the circumstances. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "In order to constitute deficient performance, the law must be settled in the area in which trial counsel was allegedly ineffective." *State v. Hanson*, 2019 WI 63, ¶28, 387 Wis. 2d 233, 928 N.W.2d 607. Counsel's deficient performance is prejudicial in the plea withdrawal context if "there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." *State v. Cooper*, 2019 WI 73, ¶29, 387 Wis. 2d 439, 929 N.W.2d 192 (citation omitted). A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶31 Ulwelling argues that his trial counsel was deficient by failing to challenge the basis for Ulwelling's traffic stop. He contends that Officer Czlapinski did not have reasonable suspicion to stop Ulwelling because Ulwelling was not violating a traffic law. Specifically, Ulwelling asserts that the vehicle he was driving had its headlamps on at the time of the stop, and that is all that is required under WIS. STAT. § 347.06(1), which he asserts is the applicable statute.

¶32    WISCONSIN STAT. § 347.06(1) provides that "no person may operate a vehicle upon a highway during hours of darkness … unless all headlamps, tail lamps, and clearance lamps with which the vehicle is required to be equipped are lighted."  It further states that the subsection "does not apply if lamps that are automatically activated whenever the vehicle is started are in use, if the headlamps are of sufficient intensity to satisfy the requirements for daytime running lamps" set forth in the Code of Federal Regulations.  *Id.*

¶33    Because Officer Czlapinski stopped Ulwelling's vehicle based on the vehicle operating without its tail lamps lit, and Czlapinski admitted the headlamps were on at the time of the stop, Ulwelling argues that Czlapinski did not have the necessary reasonable suspicion of unlawful activity to initiate the traffic stop.  Ulwelling asserts that the "vast majority of passenger vehicles produced after 2016 and operated in this state have automatically activated headlamps which comply with the federal standards for daytime running lamps" and that Czlapinski "had to have known that the 2016 Ford Explorer was a relatively new vehicle."  He therefore contends that Czlapinski should have known Ulwelling was not operating the vehicle in violation of WIS. STAT. § 347.06(1) and that his mistaken belief that the vehicle did violate the statute was objectively unreasonable because the statute is unambiguous.  Ulwelling thus argues that his counsel was deficient by not raising this issue in a motion to suppress because counsel should have known that Ulwelling was operating a vehicle covered by the exception in § 347.06(1).

¶34    "[R]easonable suspicion that a traffic law has been or is being violated is sufficient to justify all traffic stops."  *State v. Houghton*, 2015 WI 79, ¶30, 364 Wis. 2d 234, 868 N.W.2d 143.  "Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the

relevant law." ***Heien v. North Carolina***, 574 U.S. 54, 61 (2014). Traffic stops based on a law enforcement officer's mistake of law may be valid as long as the mistake is objectively reasonable. *See id.* at 60-61; ***Houghton***, 364 Wis. 2d 234, ¶¶46, 52.

¶35    As noted above, WIS. STAT. § 347.06(1) prohibits persons from operating a vehicle during hours of darkness unless the vehicle's tail lamps "with which the vehicle is required to be equipped are lighted." If those lamps "are automatically activated whenever the vehicle is started" and are in use, then the requirement does not apply as long as "the headlamps are of sufficient intensity to satisfy the requirements for daytime running lamps" in the Code of Federal Regulations. *Id.* Ulwelling interprets the exception to mean that a vehicle's tail lamps never have to be lit during hours of darkness as long as the automatically activated headlamps are on. The statutory exception appears to require, however, that all vehicle lamps be automatic and in use during hours of darkness.

¶36    Regardless of which interpretation of WIS. STAT. § 347.06(1) is correct, importantly, WIS. STAT. § 347.13(1) prohibits persons from operating a vehicle during hours of darkness "unless the motor vehicle … is equipped with at least one tail lamp mounted on the rear which, when lighted during hours of darkness, emits a red light plainly visible from a distance of 500 feet to the rear." In addition, "[n]o vehicle originally equipped at the time of manufacture and sale with 2 tail lamps may be operated upon a highway during hours of darkness or during a period of limited visibility unless both lamps are in good working order." *Id.* The phrase "good working order" means that the tail lamp is functioning for its intended use, which our supreme court described as emitting, during hours of darkness, "a red warning light that is visible to another vehicle traveling 500 feet behind it." ***State v. Brown***, 2014 WI 69, ¶33, 355 Wis. 2d 668, 850 N.W.2d 66,

*overruled on other grounds by*, **Houghton**, 364 Wis. 2d 234. When read together with § 347.06(1), § 347.13(1) can be read to impose the requirement that the automatic tail lamps in § 347.06(1) must emit a red warning light that is visible from a distance of 500 feet during hours of darkness.

¶37 At best, it is unclear whether the exception in WIS. STAT. § 347.06(1) exempts vehicles with automatic lights from the requirement in WIS. STAT. § 347.13(1) that a vehicle's tail lamps emit a red warning light visible to another vehicle traveling 500 feet behind. It may also be unclear whether the exception means that a vehicle with automatic lights never has to have its tail lamps lit during hours of darkness as long as the headlamps are on, as Ulwelling contends. To the extent there is a lack of clarity as to what the statutes require, however, that lack of clarity shows that the law regarding when tail lamps must be lit is unsettled.

¶38 Because the relevant law is unsettled, Ulwelling's counsel was not required to bring a motion challenging the traffic stop on the basis of WIS. STAT. § 347.06(1). Therefore, we conclude that Ulwelling's counsel did not perform deficiently by failing to challenge the basis for Ulwelling's traffic stop. Given that he cannot establish that his counsel was ineffective, Ulwelling is not entitled to withdraw his no-contest plea due to a manifest injustice.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.